UNITED STATES of America, Plaintiff-Appellee,

v.

Ernest Gene MOORE, Defendant-Appellant.

No. 77–3646.

United States Court of Appeals, Ninth Circuit.

Aug. 18, 1978.

---

* The Honorable Spencer Williams, United States District Judge for the Northern District of California, sitting by designation.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.

DUNIWAY, Circuit Judge:

Moore was convicted on both counts of a two-count indictment charging him and two others with attempted bank robbery, a violation of 18 U.S.C. § 2113(a), and use of firearms in the commission of a felony, the same attempted bank robbery, a violation of 18 U.S.C. § 924(c)(1). We affirm.

## I. FACTS.

On April 8, 1977, Moore was arrested outside the King-Linwood branch of the United States National Bank in Milwaukie, Oregon. He and another man were walking toward the bank. He was wearing gloves and a ski mask, not pulled down over his face, and carrying two pillowcases. A loaded pistol was concealed in the waistband of his trousers. Moore and his companion were planning to rob the bank. The FBI agents who arrested Moore had received advance notice of the planned robbery from Krossman, one of the participants. Krossman had long served as an informant for the Clark County, Washington, Sheriff's Department.

## II. "USE" OF THE GUN.

Moore claims that the evidence adduced in support of Count II of the indictment, which charged use of firearms in the commission of a felony, a violation of 18 U.S.C. § 924(c)(1), was insufficient to warrant his conviction. His argument on this point is simple. The statute, by its terms, applies to one who "uses a firearm to commit any felony for which he may be prosecuted in a court of the United States." Moore maintains that he did not "use" the gun; the evidence showed only that he had it in his possession and that it was con-

Susan Mandiberg, Portland, Or., for defendant-appellant.

William Youngman, Asst. U. S. Atty., Portland, Or., for plaintiff-appellee.

* The Honorable Robert A. Grant, Senior United States District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

cealed in the waistband of his trousers at the time of his arrest.

The fact that Moore never had an opportunity to brandish or discharge his gun does not mean that he did not "use" it. Moore attempted to rob a bank and possession of a loaded gun was an integral part of the attempt. Moore "used" his gun, much as he used the gloves and ski mask. These items increased the likelihood of success; without them he probably would not have sallied forth.

In *United States v. Grant,* 2 Cir., 1976, 545 F.2d 1309, *cert. denied,* 1977, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554, Grant was convicted of possessing cocaine with the intent to distribute it and of violating 18 U.S.C. § 924(c)(1). Guns were found in the building in which the cocaine was stored and in which Grant was arrested. The court upheld the conviction, noting, "Grant used the guns as part of a tight security operation to protect large quantities of cocaine and hence to commit the felony of possessing cocaine with intent to distribute it." 545 F.2d at 1312.

Moore's case is a stronger case than *Grant.* Moore by his own admission, was on the way into the bank for the purpose of robbing it when he was discovered with a loaded gun on his person. Possession of the weapon was not unrelated, or tangentially related, to the principal offense; obviously, Moore intended to use the gun to commit the robbery; he was using it in attempting the robbery. While we express no opinion as to the correctness of the Second Circuit's holding in *Grant,* we agree that there are situations in which mere possession of a gun can constitute "use" under § 924(c)(1). This is one such situation.

Moore directs us to the legislative history of § 924(c) and quotes passages from the House debate in an effort to show that Congress did not intend to penalize mere possession of a firearm. The legislative history of the statute is "sparse," *see, Simpson v. United States,* 1978, 435 U.S. 6, at 15, 98 S.Ct. 909, 55 L.Ed.2d 70. To the extent that the passages excerpted by Moore shed light on the meaning of § 924(c)(1) at all, they demonstrate only that Congress did not intend to penalize one who happens to have a gun in his possession when he commits an entirely unrelated offense. This is not such a case. The gun was a tool of Moore's trade of robbing banks, and it was being used in that trade.

## III. EVIDENCE OF PRIOR ROBBERIES.

At trial Moore readily admitted that he participated in the aborted bank robbery but claimed that he had done so only at Krossman's instigation. He claimed that before meeting Krossman he had enrolled in a job training program, abandoned his former life of crime, and determined to "go straight," and that Krossman's vigorous and persistent efforts to lure him into wrongdoing finally overcame his steadfast resistance.

To rebut Moore's entrapment defense the government attempted to show that Moore had robbed two banks in the recent past and was thus predisposed to commit the offense. The district court admitted evidence of one of the prior robberies and excluded evidence of the other.

Krossman, the government's principal witness, testified that on April 7, one day before the attempted robbery, he asked Moore whether he was nervous about the prospect of robbing a bank. According to Krossman, Moore replied, "We just done a job . . . over that way about a week ago," indicating the northeast section of Portland. In an effort to substantiate Krossman's testimony and to show that Moore actually had committed other bank robberies in the Portland area shortly before the attempt on the King-Linwood branch, the government attorney put the following questions:

Q: So you deny having told Tony Krossman that you robbed a bank a week before in the northeast part of Portland?

A: Yes, I deny that.

Q: All right. Do you remember telling him that once you get in the habit of

robbing banks, it was a hard habit to break?

A: Yes, I deny that, also.

Q: Isn't it true that on about March 31st, 1977, you had, in fact, robbed the Walnut Park branch of the Willamette Savings & Loan?

A: That is untrue.

Q: Isn't it true that on approximately February 21st, 1977, you participated in the robbery of the United States National Bank, Woodstock branch?

A: That is untrue. I've never participated in a robbery of any bank.

Q: All right. Mr. Moore, I would like you to look at what we have marked as—

At this point defense counsel broke in with an objection. The court sent the jury out, asked for an offer of proof, and heard arguments concerning the admissibility of the government's evidence of the prior robberies. At the conclusion of the hearing the court stated that he would exclude evidence of the Walnut Park robbery, which consisted solely of bank surveillance photographs, and would admit evidence of the Woodstock robbery, which consisted of surveillance photographs and live testimony from two witnesses.

■ Moore says that the district court ought to have ruled on the admissibility of the government's evidence before trial. Had the court done so, Moore maintains, inadmissible evidence would not have come to the jury's attention. His counsel did raise the issue before trial, and the government counsel responded that he would offer the evidence only if Moore were to claim entrapment. The court then said:

Well, I'll take that up at the appropriate time. I would certainly give you an opportunity to raise whatever objection you have, on the record and outside the presence of the jury, if you desire. As to whether or not I am going to have an independent hearing, I'll reserve a ruling on that.

The appropriate time was when the first question about one of the robberies was asked. Moreover, the court did conduct a hearing outside the jury's presence as soon as defense counsel objected. The only testimony which the jury heard before that point was the prosecutor's two queries and Moore's two denials. If Moore was prejudiced at all, he was prejudiced by his attorney's failures to object to the questions immediately, not by the court's failure to rule in advance on the admissibility of the government's evidence.

■ Moore claims that the district court erred in admitting evidence on the Walnut Park robbery. This "evidence" consisted of the prosecutor's single question—Isn't it true that you robbed the Walnut Park branch?—followed by Moore's unequivocal denial. This is not evidence of the robbery; it is a denial of it. Defense counsel did not object until after the question had been asked and answered. When he did object, the court had its hearing, and the jury heard nothing more about Walnut Park. It did hear more about Woodstock. Under these circumstances, the most natural conclusion for the jury to draw about Walnut Park is that the government had no evidence that Moore participated in that robbery. The court did not admit *any* evidence that he did participate in it.

Moore strives to liken the government's asking about the Walnut Park robbery to the conduct which the Sixth Circuit condemned in *United States v. Cunningham,* 6 Cir., 1976, 529 F.2d 884. The analogy is anything but persuasive. In *Cunningham,* the prosecutor cross-examined the defendant at length concerning evidence of other misdeeds, an examination which was "almost entirely based upon hearsay, suspicion, unverified sources and unreliable innuendo." 529 F.2d at 887. Here, in contrast, a single question was asked without objection and answered by a denial, and there is no indication that the government acted in bad faith.

■ Moore also claims that it was error to admit evidence of the Woodstock Robbery. This evidence consisted of the surveillance photographs, coupled with the testimony of a teller employed at the Wood-

stock branch, and of Katie Nelson, Krossman's sister. The teller described the robbery and vouched for the accuracy of the photographs. Then Nelson testified that four men, including Moore, had come to her house on the morning of the Woodstock robbery and returned late the same afternoon. She identified the men in the photographs as those whom she had named and testified that she could recognize Moore by his distinctive clothing and gun.

Moore claims that this evidence should have been excluded because it was not "clear and convincing," as F.R.Ev. 404(b) has been held to require. *United States v. Brashier*, 9 Cir., 1976, 548 F.2d 1315, 1325. It was not convincing, he says, because Nelson's "motives for testifying were questionable," and she was not convincing herself. We are not persuaded. The evidence was clear, and it was damning. Whether it was convincing was for the jury to decide. Nelson's possible bias against Moore went to the weight of her testimony, not its admissibility. The defense had an opportunity to impeach her if it could.

## IV. INQUIRY INTO PAROLE STATUS.

At trial Moore was cross-examined concerning three prior felony convictions. He admitted the convictions and the following exchange then took place:

Q: In fact, you were imprisoned on those charges; isn't that right?

A: Two of them, I was.

Q: And when did you get out of prison?

A: January, 1977.

Q: And were you still on parole?

A: Yes.

Q: All right. Were you on parole in April of 1977?

A: Yes.

Q: All right. Did you understand the conditions of your parole at that time?

A: Yes, I did.

Q: And did you understand that you were not to possess firearms?

A: Yes.

At this point defense counsel objected and the court sustained the objection.

 Moore now claims that the court erred in permitting the prosecutor to inquire into the conditions of his parole. However, defense counsel did not object to this line of inquiry until all of the foregoing questions had been asked and answered. At that point the questioning ceased. The limited inquiry which did take place did not amount to plain error under F.R.Crim.P. 52. The challenged questions and answers, coming, as they did, hard on the heels of the damning admissions concerning the three prior felony convictions, added little to the damage done to Moore's already tarnished image. Moreover, Moore invited inquiry into the conditions of his parole by asserting the defense of entrapment. He testified on direct that before meeting Krossman, he had abandoned his criminal ways and embarked on a legitimate career. This testimony opened the door to evidence that Moore was not leading a simon pure life, as he claimed, but was rather violating the terms of his release.

## V. SLEEPING JUROR.

 Midway through defense counsel's closing argument Moore noticed that one of the jurors appeared to be dozing. He waited for a few minutes and then passed a note to the judge who responded rather tactfully by asking the bailiff to open a window. Thereafter the judge watched the jurors attentively. He later stated that all the jurors remained alert throughout the rest of the proceedings.

Moore now says that the court should have questioned the jurors concerning their attentiveness, or lack of it, during closing argument. However, Moore made no such request at the time and seemed content with the manner in which the court chose to handle the problem. The facts are akin in many respects to those which the Seventh Circuit confronted in *United States v. Krohn*, 7 Cir., 1977, 560 F.2d 293, *cert. denied*, 1977, 434 U.S. 895, 98 S.Ct. 275, 54 L.Ed.2d 182. There, as here, the defense caught a juror napping but took no action until the appropriate moment for inquiry had passed. The court said:

The only conclusion possible from this record is that defense counsel, fully aware of the existence of the problem that is now pressed upon us, deliberately chose to proceed with the original jury to create a no-lose situation: either a not guilty verdict would be returned or an arguably tainted guilty verdict would provide a basis for appeal. We strongly disapprove such a "gamesmanship approach to criminal justice." *United States v. Kopel,* 552 F.2d 1265 at 1275–1276 (7th Cir. 1977).

560 F.2d at 297.

If Moore truly believed that one or more jurors had missed significant portions of the summation, the onus was on him to ask the court to do something about it. *Shayne v. United States,* 9 Cir., 1958, 255 F.2d 739, 745. In not conducting an examination of the juror *sua sponte,* the court did not abuse its considerable discretion in this area. *United States v. Hendrix,* 9 Cir., 1977, 549 F.2d 1225, 1227.

Affirmed.